**BJM, INC. f/k/a Bluegrass Electronics, Inc., Plaintiff,**

v.

**MELPORT CORPORATION, et al., Defendants.**

No. 3:96–CV–266–H.

United States District Court, W.D. Kentucky, Louisville Division.

March 20, 1998.

James R. Higgins, Jr., Nancy J. Schook, Middleton & Reutlinger, Louisville, Ky, for Plaintiff.

Gene F. Zipperle, Jr., Scott R. Cox, Lynch, Cox, Gilman & Mahan, Louisville, KY, for Defendant.

## MEMORANDUM OPINION

HEYBURN, District Judge.

This breach of contract case is before the Court on the motion of Plaintiff BJM, Inc. f/k/a Bluegrass Electronics, Inc. ("BJM") for partial summary judgment on its claims against Schmitt Industries, Inc. ("Schmitt") and its president, Wayne A. Case ("Case"). Defendants removed to federal court based upon diversity jurisdiction. The case concerns the duration of royalty payments under a patent license agreement which provides that it "shall continue until the last of the Patents expires."

## I.

On May 1, 1991, BJM, a manufacturer of electronic security products, and Melport Corporation ("Melport"), a Swiss corporation, entered into a license agreement granting

Melport the non-exclusive use of several patents owned by BJM (the "License Agreement"). The License Agreement, which Case negotiated on behalf of Melport, required Melport to pay a 3 % royalty on the sale price of licensed products (defined as "infrasonic detectors") and provided for a minimum annual royalty of $ 10,000. Several weeks later, Melport asked BJM to consent to the assignment of Melport's rights under the License Agreement to Schmitt, which planned to manufacture and market the infrasonic detectors. BJM consented to this assignment on June 4, 1991 (the "Assignment Agreement"). As part of the inducement for BJM to execute the License Agreement with Melport, Case executed a personal guaranty of all sums due under the License Agreement on June 13, 1991 (the "Guaranty").[1]

Schmitt never generated any revenue from the manufacture or sale of infrasonic detectors and, pursuant to the License Agreement and Guaranty, Case made the minimum royalty payments through May 1, 1994. In late April, 1995, Schmitt decided to abandon the development of products based on infrasonic technology. Shortly thereafter, Schmitt and Melport mutually agreed to terminate the Assignment Agreement.

Neither Schmitt nor Case made any further royalty payments under the License Agreement. When this case was filed, each took the position that no further payments were owed. In its motion for summary judgment, BJM countered that the Assignment Agreement and Guaranty establish the liability of both Defendants for minimum royalty payments owed under the License Agreement. In a previous Memorandum and Order, the Court agreed that Case was liable as guarantor for amounts due under the License Agreement and that Schmitt was liable as assignee of that agreement.

## II.

Now at issue is the duration of the License Agreement which determines the extent of Defendants' liability for future royalty payments. The Court will apply Kentucky law.

Section 15.1 of the License Agreement provides that "This Agreement shall be effective as and from the date first above mentioned and shall continue until the last of the Patents expires." At the time the agreement was executed, Defendants' obligations would have terminated on May 22, 2007, the date when the last patent was originally scheduled to expire. BJM contends that, due to changes in federal patent law, Defendants' liability now extends through May 30, 2009. Defendants do not appear to dispute that, pursuant to 35 U.S.C. § 154(c)(1), BJM's last patent now expires in 2009. However, they argue that Section 15.1 of the License Agreement incorporates the patent laws in effect at the time of contracting. Accordingly, their liability would extend only to May 22, 2007, the date when the last patent would have expired prior to the changes in federal law.

■ Kentucky law embraces the general proposition that "constitutional and statutory provisions in effect at the time a contract is made become a part of the contract." *Whitaker v. Louisville Transit Co.*, 274 S.W.2d 391, 394 (Ky.1954); *City of Florence v. Owen Elec. Coop.*, 832 S.W.2d 876, 882 (Ky.1992). The sweeping language of this rule has application in many different contexts.[2] However, in the context of contract interpretation, the principle may essentially function as a rule of construction: when a statutory change places the meaning of a contractual term in question, the court will presume that the parties had in mind the law in existence at the time of contract formation.

1. The Guaranty was executed after the Assignment Agreement. But, it did not mention it. Rather, it stated that it was executed as an inducement for the License Agreement.

2. For example, it is axiomatic that contract enforcement must occur against a backdrop of applicable constitutional, statutory, and common law principles. State law may define the reme-

dies available for breach. It may require that contracts contain specified provisions. Such provisions necessarily form a part of each covered contract whether or not the parties have expressly acknowledged them in a writing. The parties may themselves define contractual terms and obligations with reference to specific statutory provisions or definitions. These diverse situations all have been cited in support of the legal proposition that contracts incorporate existing

Kentucky courts have developed this rule in a line of cases dealing with the proper construction of separation agreements providing for maintenance of minor children. The first of these cases, *Wilcox v. Wilcox*, 406 S.W.2d 152 (Ky.1966) involved an agreement made in 1951, when the statutory age of majority was 21. Fourteen years later, the legislature lowered the age of majority to 18, motivating the father to seek a court order relieving him of further maintenance obligations to his 18–year–old daughter. In addressing the issue, the Kentucky Supreme Court first noted that construing the term "age of majority" required an inquiry into the parties' intent, namely, how they envisioned the agreement would operate at the time they entered into it. *Id.* 406 S.W.2d at 152–53. It then invoked the principle that the law in effect at the time of contracting becomes part of the contract. *Id.* 406 S.W.2d at 153. Based on these two premises, the Court arrived at the conclusion that since the age of majority was 21 when the parties formed the contract, the father's payments obligations would continue until the child reached that age.

Subsequent cases [3] applying the rule in *Wilcox* all have turned on the Court's determination of the parties' intent when they formed their contract. In a facile synthesis of these holdings, the Kentucky Court of Appeals recently observed that "because the age of majority at that time was statutorily defined and established as being twenty-one, the court found it to be the age the parties' [sic.] intended with respect to the duration of the support obligation." *Leathers v. Ratliff*, 925 S.W.2d 197, 199 (Ky.Ct.App.1996). Thus, it was not simply that the contracts were formed prior to the statutory change, but rather what this fact in conjunction with the language chosen by the parties suggested about their contractual intent.

The case of *Blackard v. Blackard*, 426 S.W.2d 471 (Ky.1968), decided subsequent to *Wilcox*, underscores this critical distinction. In *Blackard*, the facts were similar to those in Wilcox, except that the separation agreement contained no language referring to "age

of majority" or "minor" status. *Id.* 426 S.W.2d at 472. Distinguishing *Wilcox* and its progeny, the Court held that the father's support obligations terminated when his son reached 18 years of age:

> The fact that the parties chose to be specific concerning age with regard to the use and ownership of the house, but chose to leave to 'further orders of the Court' the matter of the amount and duration of support payments indicates to us that they had no specific intent concerning the age to which support payments, should continue.

*Id.* 426 S.W.2d at 472–73.

■ One principle which emerges from *Wilcox* and *Blackard* is that the relevant laws in effect at the time of contracting do not, without more, determine whether or not contractual obligations terminate on a particular date. Rather, it is the language chosen by the parties, interpreted in light of these statutes (and perhaps other peculiarities of their situation), which determines their contractual intent. In short, the central question is "what did the parties intend?"

Accordingly, this Court will apply the law of *Wilcox* and its progeny and presume that BJM and Melport intended the meaning of the phrase "until the last of the Patents expires" to be determined with reference to the patent laws existing at the time of contract formation. Put another way, the court must conclude that the parties did not intend to permit an expiration date other than 2007 unless the provisions of the License Agreement interpreted in light of the surrounding context "clearly establish that the parties intended to incorporate subsequent enactments into their agreement." *Feakes v. Bozyczko*, 373 Mass. 633, 369 N.E.2d 978, 980 (1977). As it turns out, a number of factors point in this direction.

Construing the contract is the Court's responsibility. That work is never formalistic. As here, it often requires discerning intent from the shades of meaning accompanying words used in particular contexts. The context of a patent licensing agreement, for

---

law. *See generally* Corbin on Contracts § 551 (1960).

**3.** *See, e.g., Showalter v. Showalter*, 497 S.W.2d 420 (Ky.1973); *Worrell v. Worrell*, 489 S.W.2d

817 (Ky.1973); *Collins v. Collins*, 418 S.W.2d 739 (1967).

instance, is quite different from that of a child support agreement or order. The phrase "age of majority" is a legally defined term which, as applied, might well suggest an intent to specify an age certain for purposes of identifying the termination of an agreement or order. Usually, patent licensing agreements concern a continuing legal right to use patent rights coextensive with the life of the patent. The patent licensing agreement has little purpose when divorced from the patent itself. On the other hand, "age of majority" may have a specific meaning and inherent intent unaffected by other circumstances. Thus, the analysis for child custody or maintenance cases does not so easily translate in the patent context.

■ More important is the manner that statutes are referenced. For instance, the intent conveyed by the words "shall continue until the last of the patents expires" is one of continuity and indefiniteness rather than a date certain.[4] These words imply a maximum time period integrally related to the central purpose of the Licensing Agreement, which is the conveyance of all of the Plaintiff's rights in existing patents. Thus, in the Court's view, both the peculiarities of the patent licensing context and the language of the particular agreement itself suggests an intent to allow the actual life span of the patents to determine the termination date of the Licensing Agreement.

This interpretation creates a logical result, while any other interpretation does not. The apparent intent of the Licensing Agreement was for Defendants to have complete control over the use and marketing of the patent for its entire life. Why would Defendants intend otherwise? Under Defendants' interpretation of the Agreement, if their marketing of the patent technology had been successful, they would nonetheless have had to forfeit the fruits of their investment to Plaintiff with two years still remaining on the patents. Hypothetically, if the statute had instead shortened the term of the patent by two years (2005), the Defendants' obligation to pay royalties could not have remained in

effect through 2007 absent the consideration of the patent continuing in effect through that year. Thus, interpreting the contractual language as intending the agreement to be coextensive with the actual life of the patent produces more logical results in all circumstances. By contrast, having the previous statutory scheme fix the duration of the Agreement tends to produce illogical results in a variety of circumstances.

The Court finds a compelling and persuasive case that by saying "until the last of the patents expires," the parties clearly understood that subsequent enactments changing the expiration dates would also change the termination date of their agreement. They did not envision a date certain which, if enforced, might have consequences at odds with the very basis of their bargain.

The Court will enter an order consistent with this Memorandum Opinion.

---

4. By contrast, the phrase "until the child reaches the age of majority" implies a date certain to be determined with reference to then-existing law.